UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>CLARE HOUSE BUNGALOW HOMES, L.L.C.,<br><br>         Debtor.<br>_____<br><br>CLARE HOUSE BUNGALOW HOMES RESIDENTS ASSOCIATION,<br><br>         Plaintiff,<br><br>vs.<br><br>CLARE HOUSE BUNGALOW HOMES, L.L.C., a Washington limited liability company, et al.,<br><br>         Defendants.<br>_____ | No. 09-04651-PCW11<br><br><br><br><br><br><br>Adv. No. 09-80164-PCW11<br><br><br><br>MEMORANDUM DECISION |

PATRICIA C. WILLIAMS, Presiding Judge

      This adversary arose from the chapter 11 case of Clare House Bungalow Homes, L.L.C. (hereinafter "Clare House"). The adversary is a dispute between creditors who recorded Deeds of Trust against the real property of Clare House to secure certain loans and the residents of the property burdened by the Deeds of Trust. The creditors allege that their rights under the Deeds of Trust are superior to the rights of the residents to occupy the premises. The residents argue that their rights to occupancy are superior to the creditors and should the creditors foreclose, they would take title subject to the rights of occupancy by the residents.

      Clare House is best described as a senior living facility. Residents must be 55 years old or older to occupy the individual units. Each unit or bungalow is the subject of a Resident Agreement. The terms

MEMORANDUM DECISION - Page 1

of the individual Resident Agreement generally provide that upon occupancy, the resident pays a lump sum for the right to occupy the premises and use the common areas until death or until physically unable to care for themselves. At that time, the bungalow is marketed to another and some percentage of the lump sum paid by the prior resident, typically eighty percent (80%), is returned to that resident's estate. The initial lump sum paid by the resident and the percentage amount of that sum ultimately distributed to the resident's estate varies from unit-to-unit and some of the terms within the agreement, which terms are not material to resolution of this issue, also vary.

The plaintiff is an association composed of 24 residents of the 28 bungalows owned and managed by Clare House. The Deeds of Trust at issue burden the large parcel of real property upon which is located all of the bungalows as well as a community center, pool and other all-common areas. Two of the members of the association recorded their Resident Agreements with the Spokane County Auditor in the real property records prior to the existence of any of the loan transactions which are secured by the Deeds of Trust. By prior summary judgment motion, the rights of those two residents to occupy have been determined to be superior to the rights of the defendant Deed of Trust holders. The rights of all residents to payment of the percentage of the initial lump sum as referenced in the Resident Agreements were determined to be contract rights enforceable against Clare House, but not against the Deed of Trust holders. The summary judgment process did not determine the superiority of the right to occupy of the residents who did not record the Resident Agreements as disputed issues of fact existed.

The first position lienholder is the "Caudill Group" which consists of (1) the Caudill Living Trust; (2) Jim and Wanell Barton; (3) Caudill Family Trust; (4) Boettcher Family Trust; (5) Kermit and Belva Williams; (6) Loutherback Living Trust; and (7) Dale and Carol Walker (hereinafter "the Caudill Group"). The Caudill Group loaned $400,000 to Clare House and recorded a Deed of Trust to secure the loan on November 24, 2004. That Deed of Trust was re-recorded on December 22, 2004 to correct the beneficiary. An additional sum of $265,000 was loaned by the Caudill Group on April 11, 2005, with a Deed of Trust recorded on the same date.

Kevin Blanchat loaned Clare House $50,000 on January 5, 2008 and another $50,000 on February 21, 2008 and those Deeds of Trust were both recorded on July 25, 2008 (hereinafter "Blanchat liens").

Peter J. Noe loaned Clare House $50,000 on March 8, 2008 and the Deed of Trust was recorded on July 28, 2008 (hereinafter "Noe lien").

Lloyd Ross and Bonnie Guthrie-Ross loaned Clare House $200,000 on March 13, 2008 and the Deed of Trust was recorded on July 28, 2008 (hereinafter "Ross lien").

Thus, the first lien is held by the Caudill Group, the second and third position liens are held by Blanchat, the fourth position lien is held by Noe, and the fifth and last position lien is held by Ross.

## THE CAUDILL GROUP LOAN

Mr. John Caudill testified he was the "point man" for the Caudill Group and passed whatever information he had about the loan to the individual members of the group. He is a retired business man who has, on behalf of the Caudill Living Trust, made what he characterized as "hard money" loans to borrowers who typically could not or did not wish to obtain loans from traditional lenders. Those loans were generally made in combination with others. He testified that the primary goal of such loans was repayment and in most situations that occurred, but he had been involved in foreclosure proceedings when necessary. His usual method of operating was to loan not more than fifty percent (50%) of the fair market value of the property and to rely upon the value of the collateral should payment not occur.

He was contacted by a loan broker, Mr. Webster, regarding this transaction and other prior transactions but, until this loan, had never consummated a transactions through Mr. Webster. He met with Mr. Webster, who has since died, on a couple of occasions regarding this transaction. He clearly recalled visiting the Clare House property with Mr. Green, the representative of Clare House. They toured the property, including one of the bungalows. Mr. Caudill testified that he knew this was a living facility for the elderly and that some of the units were occupied. The fact that the bungalows were residential units and that some were occupied would be apparent to any visitor to the property.

Initially, Mr. Caudill testified that he never asked for nor received any documents and had asked no questions regarding the loan transaction. He encouraged other members of the Caudill Group to visit the property. His answers to interrogatories, however, stated that he had received and reviewed financial information and other relevant documents regarding this transaction and that he did visit the property with at least some of the members of the group. The conclusion from his testimony was that by the time of trial, his recollection of the transaction or any discussions about it were faint. The conclusion from

his testimony is that at the time of the transaction he did not, in any meaningful way, review documentation nor conduct an analysis of creditworthiness of the borrower nor review other factors commonly reviewed by a typical "hard money" lender. He principally relied upon his opinion of the value of the large parcel of property. No other member of the Caudill Group testified.

The exhibits at trial indicated that two members of the Caudill Group, "drove by" the property, two members never saw the property, and one member, prior to the loan transaction, not only visited the property but talked with an unidentified "sales associate" and toured one of the vacant bungalows. None of the Caudill Group indicated they had reviewed any title information.[1]

The closing attorney had closed other loans for groups of lenders formed by Mr. Caudill. The attorney testified that his role was to place whatever loan terms had been negotiated into proper form, record appropriately, and disburse funds. He did no investigation of the loan desirability or property, but did obtain a title report which revealed the prior recorded Resident Agreements. This witness communicated mostly with Mr. Webster and, from those communications, understood that the collateral was rental property.

Mr. Green, the representative of Clare House, also testified regarding the meeting at the property with Mr. Caudill. Mr. Green's testimony was generally consistent with that of Mr. Caudill regarding that visit, although Mr. Caudill remembered that Mr. Green referenced "rent" being received from the bungalow. Mr. Green was unable to recount the conversation, but denied making a reference to "rent." He stated he had never considered the income from the bungalows as rent nor ever used that word describing it and would not have done so on that single occasion. His testimony on this question was credible. He also testified that he had no clear recollection of what materials he provided the loan broker, Mr. Webster, but had never made any approach to a loan broker or financial institution without preparing a loan package. The packages he prepared included information about the real property, including a description of the arrangements for occupancy and repurchase of the bungalows, income and expense information, plans for related developments, and his personal financial information. He had

---

[1] The evidence leads to the conclusion that the Caudill Group had formed a joint venture and it was conceded at trial that there was no dispute that information provided to one member of the joint venture should be imputed to the other members.

MEMORANDUM DECISION - Page 4

no specific recollection of providing a sample copy of the Resident Agreement to Mr. Webster, but believed he had done so and certainly would have provided a copy if asked.

## BLANCHAT LOANS

Mr. Blanchat presented testimony by way of a declaration in which he stated that Mr. Green had provided a general description of the property and explained that it was a retirement community and was then at full capacity. There was no discussion of the existence of the Resident Agreements, but cash flow and other financial information was provided. Mr. Blanchat did not visit the property nor receive a title report. Mr. Green testified that he recalled no specific conversations regarding the Resident Agreements, although he assumes it would have been discussed during the process. He testified that he would have given a sample agreement if asked.

## NOE AND ROSS LOANS

Mr. Robertson acted on behalf of both of these individuals and is now the personal representative of the Noe estate. Mr. Robertson did not testify, but his interrogatory answers indicate that he based his decision to lend upon the opinion of various appraisers as to the fair market value of the property, including the listing by T. J. Meenoch and that Mr. Robertson assumed that one of the appraisers had obtained a title report. There is a copy of an e-mail prior to these loans from Mr. Green to Mr. Robertson attaching information from Mr. Meenoch. That information describes the property as a retirement community and lists each bungalow with a market value and references a "resident equity" of eighty percent (80%) per unit and an assumption that each unit is resold every eight years. It also contains pictures of a row of bungalows and other amenities.

## LEGAL ISSUE

The legal issue is whether, under the circumstances which existed at the time the liens attached to the real property, the lienholders had a duty to inquire as to the interest held by the residents. If so, did the lienholders fulfill that duty?

## LEGAL ANALYSIS

Washington has adopted a statutory scheme to determine the priority and validity of various interests in real property. More than 100 years have passed since Washington adopted the cornerstone of that system, which requires the recording of documents effecting real property in the office of the

MEMORANDUM DECISION - Page 5

auditor in which county the real property is located. Rem. Rev. Stat. § 1439 (1897). Since that time, the applicable statute has provided that any unrecorded conveyance is void against a later bona fide purchaser.

The 1897 statute was repealed by 1927 Wash. Laws Ch. 278 § 2, and replaced by Rem. Rev. Stat. § 10596-2 (1927). The 1927 statute contained language identical to the current statute. RCW 65.08.070 states:

> A conveyance of real property, when acknowledged by the person executing the same (the acknowledgment being certified as required by law), may be recorded in the office of the recording officer of the county where the property is situated. Every such conveyance not so recorded is void as against any subsequent purchaser or mortgagee in good faith and for a valuable consideration from the same vendor, his heirs or devisees, of the same real property or any portion thereof whose conveyance is first duly recorded. An instrument is deemed recorded the minute it is filed for record.

With the exception of residents Raun and Hoffman whose interests were determined by prior summary judgment ruling, none of the Resident Agreements between Clare House and the plaintiff residents were recorded. Nine of the plaintiffs entered into a Resident Agreement prior to the Caudill Group Deed of Trust. Six of the residents entered into an Resident Agreement after the Caudill Group Deed of Trust, but before the Blanchat and the Noe and Ross Deeds of Trust. The right to occupy by seven other residents have since ended, thus seven bungalows are currently vacant. As the Resident Agreements were never recorded, the defendant lienholders argue that based upon the plain language in RCW 65.08.070, the rights of the residents to occupy the property is void and not enforceable as to the defendant lienholders. The plaintiff residents counter by arguing that the longstanding common law principle that a person who acquires an interest in real property with actual or constructive notice of the rights of another takes subject to the other's rights. The evidence presented by the plaintiffs demonstrated actual or, at a minimum, constructive notice of the resident's rights of occupancy to the lienholders. Constructive notice then imposes a duty upon the recipient of that constructive notice to inquire as to the circumstances of the other person's interest in the property.

By no means is this present controversy between an occupant of real property and a person who later acquires an interest in the property unique. Oliver v. McEachran, 149 Wash. 433, 271 P. 93 (1928), involved the occupancy of a strip of land subject to an unrecorded easement. At pages 439 and 95 respectively, the court held:

MEMORANDUM DECISION - Page 6

> But it seems to us that the law is well established that, where a party is in possession of land, even where the public records show the title to be in some one else, the purchaser cannot rely entirely upon the record testimony, but he must take notice also of the rights of those who are in possession. The doctrine of constructive notice is itself the work of evolution. Actual possession was at one time considered the best and only notice. Symbolical delivery of land by leaf or twig, also, in certain stages of society, met the requirements of justice. But with changing conditions constructive notice by way of registry became necessary for the interchange of real estate. It has never been held, however, to be an exclusive notice, nor to take the place of actual notice.

Together with the statutory scheme requiring recording of interests in property, it has been recognized in Washington law for 100 years that actual possession of real estate is sufficient notice to any other person acquiring an interest in that real property to impose a duty to make further inquiry regarding the specifics of occupancy. In <u>Field v. Copping, Agnew & Scales</u>, 65 Wash. 359, 118 P. 329 (1911) at pages 362 and 330 respectively, the court stated:

> The actual possession of the property by the appellants at the time the respondent acquired the title was notice to him of whatsoever rights a prudent and reasonable inquiry would have revealed. The actual possession of real property is notice to intending purchasers of the rights of those in possession, and the purchaser in such cases takes title subject to every right in the occupant that a reasonable inquiry would have disclosed. <u>Dennis v. Northern Pacific Ry. Co.</u>, 20 Wash. 320, 55 Pac. 210.

<u>See</u> <u>also</u> <u>Karlsten v. Hamel</u>, 123 Wash. 333, 212 P. 153 (1923), which involved real property used as a hotel. The court held that the actual possession of another at the time of the title transfer was notice to the purchaser of whatever rights a prudent or reasonable inquiry would have revealed.

In cases construing the 1897 and 1927 predecessors of RCW 65.08.070, Washington courts have determined that, as the right to occupy is a property right, the open apparent occupancy of a person places a duty on the person acquiring title to inquire as to the extent and nature of the occupant's interest. This conclusion is neither inconsistent with nor in conflict with the statutory language. <u>Nichols v. De Britz</u>, 178 Wash. 375, 35 P.2d 29 (1934).

In modern times, the longstanding common law rule that occupancy by a non-owner is actual notice of the right to occupy has been refined. The occupancy of the real property by a person not the owner is currently not sufficient to impose a duty to inquire as to the title to the real property. <u>Scott v. Woolard</u>, 12 Wn. App. 109, 529 P.2d 30 (1974). It is sufficient, however, to impose a duty to inquire as to the right to occupy, and a failure to inquire results in the new title holder taking title subject to whatever rights of occupancy existed.

MEMORANDUM DECISION - Page 7

In Peoples Nat'l Bank of Washington v. Birney's Enterprises, Inc., 54 Wn. App. 668, 775 P.2d 466 (1989), the plaintiff made loans over the course of years to the individual owner of the real property and to the defendant corporation which occupied the premises. The plaintiff then made a loan just to the individual owner who was also the sole owner of the corporation. The plaintiff obtained title reports prior to making the loan, but such report did not disclose the unrecorded lease between the individual owner and the corporation. After citing RCW 65.08.070, the court concluded that the plaintiff could foreclose the Deed of Trust granted by the owner, but was subject to the continued right of occupancy of the corporation under the terms of the unrecorded lease. Noting that the corporation "was quite visibly in possession of the property" and that the owner would have provided a copy of the unrecorded lease if requested, the court held that the plaintiff's failure to inquire into the nature of the occupancy was neither reasonable nor prudent. After noting "we have found no case excusing inquiry where possession is viable and evident," the court held that the corporation's right of occupancy under the unrecorded lease was superior to the plaintiff's right to occupy after foreclosure of the Deed of Trust.

In this particular situation, the evidence indicated that it would have been apparent to the most casual observer that the real property consisted in part of several single family residential units. The business model of Clare House was to construct and sell bungalows and, upon the death of the resident, to pay the resident some lump sum and then resell the bungalow. It is difficult to believe that lenders who received financial and other information from Clare House would not have been aware of the basic business model of the borrower. Whether or not a sample Resident Agreement was provided, the bungalows were obviously occupied by individuals other than the owner of the property which imposed a duty to inquire as to the rights of those residents.

The Caudill Group obtained a title report on the property, which revealed the two recorded Resident Agreements, but the evidence at trial did not reveal that any inquiry was made regarding the existence of other Resident Agreements or even the terms of the recorded Resident Agreements. Mr. Green, at all times, was willing to provide a sample copy of a Resident Agreement and believed that he had done so to Mr. Webster. The representative of the lenders of the Noe and Ross liens received information from Mr. Meenoch regarding the individual units and Clare House's business model of selling and reselling bungalows. The evidence at trial did not reveal that any inquiry was made

MEMORANDUM DECISION - Page 8

regarding the occupancy of the bungalows. Mr. Blanchat knew the real property constituted a retirement community which was at "full capacity." The evidence at trial did not reveal that any further inquiry was made.

Each lienholder had actual notice of the occupancy of the bungalows by residents. Each lienholder had a duty to make reasonable and prudent inquiry as to the terms of that occupancy if the lienholder desired to obtain rights greater than the occupants. By failing to make any inquiry, each of the defendant lienholders are subject to the terms of the Resident Agreement to the extent the Resident Agreement grants rights in the real property.

## CONCLUSION

The court finds that the holders of the Resident Agreements have a right to occupy, which is superior to the rights of the lienholders. The lienholders have all remedies available under state law regarding the enforcement of the Deeds of Trust, but cannot enforce them in such a way as to interfere with the residents' superior right of occupancy. Due to the failure to make reasonable inquiry as to the rights of those occupying the property, the rights of the lienholders are subject to the right of occupancy granted by the Resident Agreements.

A hearing will be scheduled for plaintiff's counsel to present an order and judgment consistent with the court's ruling.

_/s/ Patricia C. Williams_
Patricia C. Williams
Bankruptcy Judge

03/11/2011 12:48:46

MEMORANDUM DECISION - Page 9